1

2

3

4

5

6

7

8               IN THE UNITED STATES DISTRICT COURT

9               FOR THE EASTERN DISTRICT OF CALIFORNIA

10   RAYMOND CHRISTIAN FOSS,

11          Petitioner,                    No. 2:09-cv-3551 JAM-JFM (HC)

12      vs.

13   MIKE MARTEL, Warden,                  ORDER AND

14          Respondent.                    FINDINGS AND RECOMMENDATIONS

15   _____/

16          Petitioner is a state prisoner proceeding pro se with an application for a writ of

17   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner is serving a sentence of six years plus

18   thirty years to life in prison following her 2005 conviction on multiple charges of child

19   molestation.  Petitioner raises eleven claims in his petition, filed December 23, 2009.

20   Respondent contends the claims are without merit.

21          In his traverse, filed December 15, 2011, petitioner moves to defer resolution of

22   the substance of his claims pending further factual development.  Petitioner has moved for an

23   evidentiary hearing on seven of his claims and to expand the record in this action pursuant to

24   /////

25   /////

26   /////

1

1    Rule 7 of the Rules Governing Section 2254 Cases in the United States District Courts.

2    Respondent opposes these motions.[1]

3           By his first motion to expand the record, petitioner seeks to expand the record to

4    include all of the exhibits appended to his petition for writ of habeas corpus.[2]  Petitioner contends

5    these exhibits are relevant to the need for an evidentiary hearing, resolution of disputed issues of

6    fact that may arise at such hearing, and the need to develop the factual basis for petitioner's

7    claims at that hearing.  It appears that all evidence relevant to petitioner's claims that is attached

8    to the petition was also included in the state court record.[3]  Petitioner's motion is therefore

9    unnecessary and will be denied.

10          By his second motion to expand the record, petitioner seeks to include deposition

11   testimony given by Chevelle Washington and Kevin McCollum in criminal proceedings against

12   petitioner in Florida.  Both of these individuals testified at petitioner's trial, and he contends that

13   their deposition testimony will prove "that evidence given at the trial was based on perjured

14   testimony."  Notice of Motion and Motion for Leave of Court to File a Supplemental Motion to

15   Expand the Record, filed February 21, 2012, at 2.  Petitioner provides no information concerning

16   the substance of the deposition testimony of either witness.  The motion will be denied.

17   /////

18   /////

19   _____

20       [1]  On March 22, 2012, petitioner filed a motion for an extension of time to file a reply
     brief in support of his motions to expand the record.  Petitioner filed his reply brief on March 27,

21   2012.  Good cause appearing, petitioner's March 22, 2012 motion will be granted and
     petitioner's March 27, 2012 reply brief deemed timely filed.

22       [2]  In part, petitioner contends that he is unable to verify that respondent has lodged all

23   relevant parts of the state court record due to this court's denial of petitioner's request for service
     of the state court records lodged by respondent.  In opposition to the motion, respondent

24   represents that he has submitted to this court every document that could possibly have been in the
     state court record.  See Opposition to "Motion for Expansion of the Record", filed December 28,

25   2011, at 2.  Respondent contends that motion is therefore moot.

26       [3]  This court will, throughout the findings and recommendations, as appropriate cite to
     both petitioner's exhibit and its location in the state court record lodged by respondent.

On December 3, 2011, petitioner filed a motion for an evidentiary hearing on the first seven claims raised in his petition.  Respondent opposes the motion.[4]

Section 2254(e)(2) provides in relevant part that if a habeas petitioner "has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that – (A) the claim relies on – . . . (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."  28 U.S.C. § 2254(e)(2).  All of the evidence presented by petitioner in support of his first seven claims for relief was also presented to the state courts, and there is no showing that additional factual development is either warranted or proper.  For that reason, petitioner's motion for evidentiary hearing will be denied, as will his motion to defer resolution of the substance of his claims.

Finally, on April 30, 2012, petitioner filed a motion for leave to file a second supplemental motion to expand the record.  For the foregoing reasons, that motion will be denied.

FACTS[5]

*Background*

> Brittany's natural father died before she was born, and her mother married [petitioner] when Brittany was two years old. Brittany considered [petitioner] to be her father and called him "Dad."  [Petitioner] and Brittany's mother had a child, Cameron, who was two years younger than Brittany.  In 2002, when Brittany

---

[4] On March 7, 2012, petitioner filed a motion for a twelve-day extension of time to file a reply to respondent's opposition.  Petitioner filed a reply brief on March 19, 2012 and an amended reply brief on April 4, 2012.  Good cause appearing, petitioner's motion for extension of time will be granted and petitioner's reply and amended reply briefs deemed timely filed.

[5] The facts are taken from the opinion of the California Court of Appeal for the Third Appellate District in <u>People v. Foss</u>, No. C050992 (Sept. 13, 2007), a copy of which is attached as Exhibit A to respondent's amended answer to the petition, filed June 15, 2010.

was 12 years old, her mother passed away, leaving Brittany in [petitioner]'s sole custody.  They were living in Fresno.

Within just a few months after the death of Brittany's mother, [petitioner] molested Brittany for the first time.  Cameron was away at a friend's house, leaving Brittany and [petitioner] in the house alone.  [Petitioner] told Brittany to come to his room because he wanted to talk about sex.  The front door was locked.  They went into [petitioner]'s bedroom, and [petitioner] locked the bedroom door.  [Petitioner] told Brittany to take off her pants.  She asked why, and petitioner said it was because he needed to talk to her about sex and that he needed to show her.  Brittany felt she could not argue with [petitioner].  She asked why they could not just talk about it, and [petitioner] said that they could not because it was too hard for him.  He did not know how.  [Petitioner] told Brittany that sex is what boys wanted and he did not want Brittany to end up having sex with one of them.  After Brittany's pants and underwear were off, [petitioner] touched the outside of her vagina with his fingers, moving them around, for about 15 minutes.  [Petitioner] asked if it felt good, and Brittany replied that she did not know.  Finally, [petitioner] told Brittany to put her pants back on and told her she would not have to do that again.  [Petitioner] made Brittany promise not to tell anyone because they might think it was "weird" or they might "do something."  [Petitioner] told Brittany she could not leave because he was her father.

[Petitioner] introduced Brittany and Cameron to a woman named Lisa Tennison.  While visiting Tennison's house, Brittany and Cameron heard [petitioner] and Tennison having sex.  [Petitioner] bought a motorcycle and left Brittany and Cameron with friends for a couple weeks while he went on a trip to Sturgis, South Dakota.  [Petitioner] returned from the trip with a woman named Brandi Nichols, who was 21 years old.

Soon after the Fresno molestation, which was not charged in this case, and just two weeks before Brittany turned 13, [petitioner] and the children moved to Redding  Until [petitioner] found a place for them to live, they stayed with [petitioner]'s stepfather.  After residing there for about a week, they moved to a residence on Irene Street.  At first, Nichols visited occasionally to clean the house, but eventually she moved in.  Brittany liked Nichols, considering her as a big sister, but not a mother figure.

*First Charged Incident – Residence of [Petitioner]'s Stepfather*

- *Count 1 – Section 269, subdivision (a)(4) (Aggravated Sexual Assault of a Child (Oral Copulation))*
- *Count 2 – Section 288, subdivision (b) (Forcible Lewd Act on a Child*

/////

On one evening while [petitioner] and the children were living with [petitioner]'s stepfather, Cameron and [petitioner]'s stepfather went to ride quads (all-terrain vehicles). This left Brittany and [petitioner] alone at the house. [Petitioner] told Brittany that he needed to talk to her about sex again. She protested that they had already talked about it and asked if they really needed to talk about it again. [Petitioner] said they did, and he took her into her bedroom. [Petitioner] locked the door and made Brittany "pinkie-promise" that she would not tell anyone. [Petitioner] told Brittany to take off her pants, which she did because she did not know what else she could do. She felt like she could not say no because she felt he "overpowered" her and he could not say no to a parent. He told her to lay on the bed and she did. She was taking off her underwear slowly when [petitioner] intervened and pulled them down to her ankles. [Petitioner] fondled Brittany's vagina with his fingers and then put his mouth on her vagina. After about 15 minutes, [petitioner] said something about sperm, got off the bed, took off his pants and underwear, and rubbed his penis to make it hard. [Petitioner] had Brittany touch his penis. He rubbed sperm on Brittany's stomach. When all of this was happening, Brittany just wanted it to be over. [Petitioner] told Brittany to put her pants on and go wash herself. Brittany did not tell anyone about the incident because she did not know whom to trust.

*Second Charged Incident – Irene Street Residence*

- *Count 3 – Section 288, subdivision (b) (Forcible Lewd Act on a Child)*
- *Count 4 – Section 288, subdivision (b) (Forcible Lewd Act on a Child)*

Some time after [petitioner] moved with Brittany and Cameron to the house on Irene Street, Cameron was away at a friend's house. [Petitioner] locked the front door. Brittany could not remember if she and [petitioner] were in her bedroom or [petitioner]'s bedroom. [Petitioner] told Brittany to take off her pants and underwear and lie on the bed. She complied. [Petitioner] opened Brittany's legs and fondled her vagina with his fingers. He then directed Brittany to do the same and "to feel the right spot." She touched herself for about five minutes while [petitioner] watched. It made her feel "weird." Brittany told [petitioner] she did not want to do it anymore. He said, "okay."

*Third Charged Incident – In the Closet*

- *Count 5 – Section 269, subdivision (a)(4) (Aggravated Sexual Assault of a Child (Oral Copulation))*
- *Count 6 – Section 288, subdivision (b) (Forcible Lewd Act on a Child)*
*Count 8 – Section 269, subdivision (a)(1) (Aggravated Sexual Assault of a Child (Rape))*

5

About two or three months after the first incident in the Irene Street house, Brittany went to get shoes out of [petitioner]'s closet and found a dildo.[6]  She asked Nichols, who had moved in by then, what it was used for.  Nichols would not answer Brittany's question and later told [petitioner] about the question.  Soon after Brittany talked to Nichols about the dildo, Brittany and [petitioner] were again alone in the house.  [Petitioner] told Brittany that he had heard she asked Nichols about the dildo.  [Petitioner] asked Brittany if she wanted to know about it, and Brittany said she did.  [Petitioner] took Brittany into his bedroom, locking the bedroom door, and into the closet, also locking the closet door.  [Petitioner] retrieved the dildo from some folded clothes and told Brittany to lie down on the floor and take off her pants and underwear.  He knelt next to Brittany, holding the vibrating dildo.  Brittany, on the floor with her pants and underwear pulled down, was startled and wanted to know what [petitioner] was going to do.  [Petitioner] held the dildo against Brittany's vagina.  Stating that his mouth would work better, [petitioner] put down the dildo and put his mouth on Brittany's vagina, moving his tongue around.  [Petitioner] took off his pants and put his penis in Brittany's vagina, "barely putting it in."  Brittany told him she did not want him to do it because she was scared and did not want it to hurt.[7]  [Petitioner] stopped.  Both Brittany and [petitioner] were sweating so they left closet.  [Petitioner] has a cigarette.

*Fourth Charged Incident – Digital Penetration*

•  *Count 7 – Section 269, subdivision (a)(5) (Aggravated Sexual Assault of a Child (Sexual Penetration))*

On an occasion that Brittany believed was different from the closet incident, [petitioner] put his finger inside her vagina.  It hurt her.

A "couple months" later, [petitioner] told Brittany he needed to show her more about sex, she said, "No," and [petitioner] replied, "Okay.  I'm going to work now."

*Fifth Charged Incident – [Petitioner] and Brittany Sleeping Together*

•  *Count 9 – Section 288, subdivision (a) (Lewd Act on a Child)*

---

[6]  Brittany referred to it as a "dildoy" in her testimony.

[7]  When the prosecutor asked a follow-up questions about how far [petitioner] inserted his penis in her vagina, Brittany replied:  "Not even close.  It was like right up to my vagina and I told him, no."

[Petitioner] and Nichols had an argument, so she left the house. Cameron was also away at a friend's house, staying the night. [Petitioner] told Brittany to come sleep with him. She did not want to, but [petitioner] said, "Come on, we never get to sleep in the same bed." During the night, [petitioner] put his fingers down Brittany's pants, touching her vagina. When the telephone rang, Brittany took the opportunity to go get in her own bed.

*Sixth Charged Incidents – Horseplay*

- *Count 10 – Section 242 (Battery)*
- *Count 11 – Section 289, subdivision (j) (Sexual Penetration on a Child*

While they were living in Redding, [petitioner] sometimes gave Brittany "wedgies," which Brittany described as pulling up her underwear until it hurt, depending upon how hard [petitioner] pulled. Sometimes her underwear would get bundled up and go up her vagina. When they were roughhousing once, [petitioner] inserted his finger into Brittany's anal opening.

*Reporting of the Molestations*

In the summer of 2003, after living in Redding for about one year, [petitioner] moved with Nichols, Brittany, and Cameron to Florida. On October 2 of that year, [petitioner], Cameron, and Brittany were roughhousing in a bedroom. [Petitioner] lay on Brittany, hurting her, so she slapped his face. [Petitioner] became angry, told Cameron to leave the bedroom, locked the door and told Brittany he was going to give her a spanking. [Petitioner] told Brittany to pull down her pants and underwear. She followed [petitioner]'s directions. She was in her pajamas and was not wearing a bra. [Petitioner] told Brittany to pull her top over her head. As Brittany stood there exposed, [petitioner] sat on the bed and stared at her. When she tried to pull her top back down, he pulled it back up over her head and told her to keep it there. Eventually, [petitioner] told Brittany to put her clothes back on, and he left.

Brittany spoke to Nichols, who told Brittany she should not have slapped her father. Nichols explained to Brittany that she had found child pornography on [petitioner]'s computer and that Nichols's stepfather had molested her when she was young. Nichols expressed fear that [petitioner] would have sex with Brittany. Nichols asked whether [petitioner] had "done anything" to Brittany, and Brittany replied that he had.

Brittany and Nichols made a plan to leave the next day, and Nichols called her sister for assistance. Brittany and Nichols went to bed, but Nichols's sister called an abuse hotline. Chevelle Washington of the Florida Department of Children and Families

responded to the call along with Officer Kevin McCollum of the Apopka Police Department.  They arrived at [petitioner]'s residence at about midnight.  After speaking with Nichols, they awakened Brittany at about 1:00 a.m. and questioned her.  The interview lasted about 10 or 15 minutes.  This was the only time Washington interviewed Brittany.  The interview was to assess the risk.  It was not a forensic interview.  Officer McCollum interviewed Brittany for about an hour at the police department after they transported Brittany there.  This interview was also not intended to be a detailed, comprehensive interview concerning everything that had happened to Brittany.  It was intended to get a basic idea of what law enforcement was required to do.  Brittany signed a statement at 2:53 a.m.[8]

Brittany was taken to a group home where she stayed for several weeks.  During her stay at the group home, Brittany met a 17-year-old girl who described her sexual experiences to Brittany.

*Brittany's Alleged Animosity for [Petitioner]*

[Petitioner] attempted to establish that Brittany did not like him.  Defense counsel asked Brittany whether, prior to her mother's death, she liked [petitioner].  Brittany replied that she "didn't really dislike him."  She later told an officer who interviewed her that she had not liked [petitioner] since she was five years old and wished that her mother would have divorced him.  Brittany believed [petitioner] had been cheating on her mother before her mother died.  Brittany also did not like the fact that [petitioner] was dating two women, Tennison and Nichols, at the same time.

Around the time of the death of Brittany's mother, Kaiser Hospital paid a settlement for malpractice.  Brittany's aunt told Brittany that [petitioner] may have spent the money.  Brittany was under the impression that [petitioner] was going to withhold the money from her.

*[Petitioner]'s Testimony*

[Petitioner] denied molesting Brittany.  He testified that he never told her he was going to talk to her about sex or demonstrate it.  He never orally copulated her or touched her in any sexual way.  One winter night, when the heater was not working, [petitioner] made a fire in the fireplace and had Brittany sleep with him in a sleeping bag.  He acknowledged giving Brittany "wedgies" but did

/////

---

[8]  Brittany testified that the interview at the police department was about five hours long.  The accuracy of her estimation of time is doubtful, given that she did not arrive at the police department until around 2:45 a.m., she signed a statement at 2:53 a.m., and she left the station for placement at a group home at about 3:45 a.m.

1   not touch her bottom.  He playfully bit her bottom at time when
2   she had jeans on.

3   [Petitioner] also testified that he and Nichols had discussed
    marriage.  A week before the molestations were reported,
4   [petitioner] told Nichols that he would not marry her.  They had a
    major fight.

5   People v. Foss, slip op. at 4-13.

6   ANALYSIS

7   I.  Standards for a Writ of Habeas Corpus

8   Federal habeas corpus relief is not available for any claim decided on the merits in

9   state court proceedings unless the state court's adjudication of the claim:

10   (1) resulted in a decision that was contrary to, or involved an
     unreasonable application of, clearly established Federal law, as
11   determined by the Supreme Court of the United States; or

12   (2) resulted in a decision that was based on an unreasonable
     determination of the facts in light of the evidence presented in the
13   State court proceeding.

14   28 U.S.C. § 2254(d).

15   Under section 2254(d)(1), a state court decision is "contrary to" clearly

16   established United States Supreme Court precedents if it applies a rule that contradicts the

17   governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially

18   indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different

19   result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406

20   (2000)).

21   Under the  "unreasonable application" clause of section 2254(d)(1), a federal

22   habeas court may grant the writ if the state court identifies the correct governing legal principle

23   from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

24   prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ

25   simply because that court concludes in its independent judgment that the relevant state-court

26   decision applied clearly established federal law erroneously or incorrectly.  Rather, that

9

1  application must also be unreasonable." Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75

2  (2003) (it is "not enough that a federal habeas court, in its independent review of the legal

3  question, is left with a 'firm conviction' that the state court was 'erroneous.'")

4          The court looks to the last reasoned state court decision as the basis for the state

5  court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  Where the state court

6  reaches a decision on the merits but provides no reasoning to support its conclusion, a federal

7  habeas court independently reviews the record to determine whether habeas corpus relief is

8  available under section 2254(d).  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

9  II.  Petitioner's Claims

10     A.  Brady Violations

11         Petitioner's first claim is that his right to due process was violated by the

12  prosecution's failure to disclose evidence in accordance with the requirements of Brady v.

13  Maryland, 373 U.S. 83 (1963).  Petitioner contends that the prosecutor failed to disclose the

14  following, all of which he contends were exculpatory and/or necessary to impeachment of

15  prosecution witnesses:  (1)  Brittany's original statement to Chevelle Washington; (2)

16  Department of Children and Family Services [DCFS] case file related to the testimony of

17  Chevelle Washington, plus Ms. Nichols and Brittany; (3) Statements made under oath by Officer

18  Rowen in connection with the initial preliminary examination; (4) Statements and reports in the

19  possession of the Fort Mill Police Department in South Carolina implicating the misconduct of

20  Officer Rowen; (5) Statements, reports and a declaration in the possession of the Shasta County

21  Jail related to Officer Rowen's testimony and misconduct; and (6) Post judgment discovery of

22  exculpatory evidence directly related to the credibility of a key prosecution witnesses.[9]

23         Petitioner raised this claim in the state courts in petitions for writ of habeas corpus

24  filed in the Shasta County Superior Court, the California Court of Appeal for the Third Appellate

25  _____

26         [9]  In addition, petitioner complains that the Shasta County District Attorney failed to
   provide discovery in state habeas corpus proceedings after an order to show cause had issued.

1    District, and the California Supreme Court.  See Lodged Documents 9, 10 and 11.  None of the

2    state courts issued a reasoned decision denying the claim.  See id.[10]

3              Under Brady, the prosecution has an obligation to provide exculpatory evidence to

4    a criminal defendant.  To establish a Brady violation, petitioner must establish that the prosecutor

5    suppressed, "either willfully or inadvertently", favorable exculpatory or impeachment evidence

6    and that the evidence was material, or there was prejudice from the failure to disclose the

7    evidence.  U.S. v. Blanco, 392 F.3d 382, 387 (9th Cir. 2004) (citing Benn v. Lambert, 283 F.3d

8    1040, 1052-53 (9th Cir.2002)).  Under Brady, evidence is material, and the failure to disclose

9    prejudicial, "only if there is a reasonable probability that, had the evidence been disclosed to the

10   defense, the result of the proceeding would have been different." United States v. Bagley, 473

11   U.S. 667, 682 (1985); see also Gantt v. Roe, 389 F.3d 908, 913 (9th Cir. 2004) (citing Strickler v.

12   Greene, 527 U.S. 263, 281-82 (1999)).

13              1.  Brittany's Initial Statements/Chevelle Washington's Field Notes/ DCFS File

14              Petitioner first contends that the prosecutor failed to produce handwritten notes

15   made by Chevelle Washington, the Florida Department of Children and Families Services

16   (DCFS) investigator who interviewed Brittany the night the crimes were reported to Florida

17   authorities.[11]  Petitioner contends the handwritten notes would have revealed material

18   inconsistencies between Brittany's initial report to Washington and Brittany's trial testimony, in

19   particular that Brittany did not describe in that initial interview all of the incidents to which she

20   testified at trial. Petitioner contends the notes would have supported his attorney's efforts to

21   impeach Brittany on cross-examination.  Petitioner also contends that the notes were "directly

22

23        [10]  The state superior court erroneously rejected the claim on the ground that it had been
     raised and rejected on directed appeal and petitioner had shown nothing new in the habeas
     petition to warrant further consideration of the claim.  Foss v. Martel, No. 08HB5424, slip op. at
24   4-5.  Petitioner did not raise a Brady claim on direct appeal.  See Petition at 3.1, 4.1, 6, 7.

25        [11]  A copy of the notes is attached as Exhibit A to the Petition; a copy of the notes is in the
     state court record in Lodged Document 58, Ex. F to Petition for Writ of Habeas Corpus filed in
26   Third Appellate District Court, at 3.

related" to Ms. Washington's credibility.  See Attachment A to Petition at 8.  Respondent

contends that there is no evidence the prosecution suppressed these notes, no showing that the

handwritten notes would have been admissible at trial, no showing that the handwritten notes

were exculpatory, and no showing that they were material.

        In the petition, petitioner represents that he obtained a copy of the original Florida

Department of Children and Family file after trial.  Attachment A to Petition at 2.  He contends

that the file contains the hand notes and two reports that "establish facts" which discredit "some,

if not all of Washington's trial testimony."  Id. at 3.  There is no showing that the prosecutor

suppressed the discovery of Washington's handwritten notes or the other reports.  Moreover, the

information in the notes and reports is not exculpatory, and would not have supported further

impeachment of either Brittany or Chevelle Washington, both of whom testified at trial that

Brittany did not tell Ms. Washington about all of the molestation on the night Ms. Washington

interviewed Brittany.  See Reporter's Transcript of Proceedings (RT) at 83:26-90:7; 92:27-93:13;

146:1-20.  Nor is there anything in the notes which would have implicated Ms. Washington's

credibility.  Finally, there is nothing in the record that suggests that the outcome of petitioner's

trial would have been different had these notes and reports been in his possession at the time of

trial.

        2.  Officer Rowen

        Petitioner next contends that the prosecutor failed to disclose testimony given by

prosecution witness Officer Rowen at an initial preliminary hearing against petitioner, or

statements and reports in the possession of the Fort Mill Police Department in South Carolina or

the Shasta County Jail implicating misconduct by Officer Rowen.[12]  These pieces of evidence are

---

[12]  The transcripts are attached as Exhibit F to the Petition; a copy of the transcript is in
the state court record in Lodged Document 58, Ex. Q to Petition for Writ of Habeas Corpus filed
in Third Appellate District Court.  The Fort Mill Police Department records are attached as
Exhibit G to the petition and appear in the state court record in Lodged Document 58, Ex. R to
Petition for Writ of Habeas Corpus filed in Third Appellate District Court.  The Shasta County
Jail records are attached as Exhibit I to the Petition.  They are not identified as an exhibit to

all connected to arrests of petitioner and two preliminary examinations that preceded the final

charging document on which petitioner proceeded to trial.  Petitioner contends that this evidence

would have support either a pretrial motion to dismiss the charges or impeachment of Officer

Rowen, or both.

There is no evidence that the prosecutor suppressed the discovery of any of this

information.  Nor is there any reasonable probability that the outcome of the criminal

proceedings against petitioner would have been different had this evidence been presented to the

trial court or the jury during those proceedings.

### 3. Discovery Motion on State Habeas

The final contention of petitioner's <u>Brady</u> claim is that the Shasta County District

Attorney's Office failed to provide so-called "Brady materials" in response to a motion for

discovery propounded by petitioner during his state habeas corpus proceedings.  The rule

announced in <u>Brady</u> does not extend to postconviction proceedings.  <u>See District Attorney's</u>

<u>Office for Third Judicial Dist. v. Osborne</u>, 557 U.S. 52, 129 S.Ct. 2308, 2319-20 (2009).

For all of the foregoing reasons, petitioner's first claim for relief is without merit

and should be denied.

### B. Napue Violations – False Testimony; Newly Discovered Evidence

Petitioner's second claim is that his constitutional rights were violated by

admission of false testimony.  Petitioner claims that the victim, Brittany D., gave false testimony,

as did Chevelle Washington, Officer McCollum, Officer Rowen, and Brandi Nichols.[13]

Petitioner raised this claim in the state courts in petitions for writ of habeas corpus filed in the

Shasta County Superior Court, the California Court of Appeal for the Third Appellate District,

---

either in petitioner's state superior court or court of appeal habeas corpus petition, <u>see</u> Lodged
Document 58, Vol. 1 and Lodged Document 59, Vol. 1, but it does not appear that they contain
evidence material to resolution of the claim at bar.

[13]  Brandi Nichols is also referred to as Brandy Nichols in this record.

1  and the California Supreme Court.  See Lodged Documents 9, 10 and 11.  None of the state

2  courts issued a reasoned decision denying the claim.  See id.

3            "The knowing use of false evidence by the state, or the failure to correct false

4  evidence, may violate due process.  See Napue [v. People of State of Ill.], 360 U.S. [264] at 269,

5  79 S.Ct. 1173 [(1959)].  To establish a Napue claim, a petitioner must show that '(1) the

6  testimony (or evidence) was actually false, (2) the prosecution knew or should have known that

7  the testimony was actually false, and (3) ... the false testimony was material.' United States v.

8  Zuno–Arce, 339 F.3d 886, 889 (9th Cir.2003) (citing Napue, 360 U.S. at 269–71, 79 S.Ct.

9  1173)." Towery v. Schriro, 641 F.3d 300, 308 (9th Cir. 2010).

10           Petitioner has established neither that the testimony he cites was false, nor that the

11  prosecutor knew or should have known that the testimony was false.  The state courts' rejection

12  of this claim was neither contrary to nor an unreasonable application of clearly established

13  United States Supreme Court precedent.

14           Petitioner also claims that he has newly discovered evidence that Brandi Nichols

15  "coached and influenced Brittany D. to make the allegations" against him.  Attachment to

16  Petition at 24.  Petitioner raised this claim in a request for permission to file a supplemental

17  petition in the state superior court.  See Lodged Document 9, Ruling on Petitioner's Request to

18  File a Supplemental Petition, at 1.  The state court rejected the claim on the ground that petitioner

19  had "filed nothing in support of his claim other than his own self-serving declaration." Id. at 2.

20           Petitioner now presents a letter, signed under penalty of perjury, by Daniel Patrick

21  Post, who was married to Brandi Nichols from August 2006 until 2008, in which Mr. Post avers,

22  inter alia, that

23           [o]ne night between April and June of 1997, while drinking heavily
             Brandy told me how she convinced Brittany to testify against
24           Raymond Foss and that now he was paying for it.  She bragged that
             she taught Ray a lesson for crossing her and not wanting to marry
25           her after she had give [sic] up everything and moved to Florida to
             be with him.  She explained that she gave Brittany sexual details
26           similar to what she had suffered as a child.  She bragged that she

was a big influence on Brittany and that after only a short time
Brittany viewed her more as a mother, that [sic] she did Ray as a
father...despite her only being 20 years old.  Brandy thought of
herself as very mature and made it clear she thought she was
smarter than pretty much everyone.  Brandy said the courts told her
she wasn't allowed to contact Brittany anymore, but she secretly
went to visit Brittany a few times after the incident where she was
taken from the home to check on her and to ensure Brittany
wouldn't "chicken out."

Petitioner's Ex. BB.[14]  This letter does not establish petitioner's innocence, nor does it support

any contention that the prosecutor knowingly presented false testimony.

        For the foregoing reasons, petitioner's second claim for relief should be denied.

        C.  <u>Vindictive Prosecution</u>

        Petitioner's third claim is that his constitutional rights were violated by vindictive

prosecution.  The predicate for this claim is that the original criminal complaint against

petitioner, which was dismissed after a preliminary hearing, contained only four felony charges,

but after two preliminary hearings and six months of investigation petitioner was ultimately

charged by information with nineteen felony counts.  Petitioner contends that additional and

more serious charges were added to punish petitioner for exercising his right to a preliminary

hearing and to go to trial.  Petitioner raised this claim in the state courts in petitions for writ of

habeas corpus filed in the Shasta County Superior Court, the California Court of Appeal for the

Third Appellate District, and the California Supreme Court.  <u>See</u> Lodged Documents 9, 10 and

11.  None of the state courts issued a reasoned decision denying the claim.  <u>See id</u>.[15]

        A prosecutor has wide discretion to decide whether to prosecute an individual and

what charges to file "so long as the prosecutor has probable cause to believe that the accused

---

[14]  It is unclear whether this document was presented to the state courts, but in any event respondent does not contend that this claim is unexhausted.

[15]  The state superior court erroneously rejected the claim on the ground that it had been raised and rejected on directed appeal and petitioner had shown nothing new in the habeas petition to warrant further consideration of the claim.  <u>Foss v. Martel</u>, No. 08HB5424, slip op. at 4-5.  Petitioner did not raise a claim of vindictive prosecution on direct appeal.  <u>See</u> Petition at 3.1, 4.1.

1    committed an offense defined by statute." <u>Bordenkircher v. Hayes</u>, 434 U.S. 357, 364, 98 S.Ct.

2    663, 54 L.Ed.2d 604 (1978).  Even with that broad discretion, however, a prosecutor may not

3    punish "a person because he has done what the law plainly allows him to do." <u>United States v.</u>

4    <u>Goodwin</u>, 457 U.S. 368, 372 (1982).  "For example, a 'prosecutor violates due process when he

5    seeks additional charges solely to punish a defendant for exercising a constitutional or statutory

6    right.'"  <u>Nunes v. Ramirez-Palmer</u>, 485 F.3d 432, 441 (9th Cir. 2007) (quoting <u>United States v.</u>

7    <u>Hernandez–Herrera</u>, 273 F.3d 1213, 1217 (9th Cir.2001)).

8            "'[E]xceptionally clear proof' is required before inferring an abuse of

9    prosecutorial discretion." <u>Nunes</u>, <u>id</u>. (quoting <u>McCleskey v. Kemp</u>, 481 U.S. 279, 297 (1987).  ,

10   "'Ordinarily, [courts] presume that public officials have properly discharged their official duties.'

11   <u>Banks v. Dretke</u>, 540 U.S. 668, 696 (2004) (citations omitted). As such, where a defendant

12   contends that a prosecutor made a charging decision in violation of the Constitution, the

13   defendant's 'standard [of proof] is a demanding one.' <u>United States v. Armstrong</u>, 517 U.S. 456,

14   463 (1996)." <u>Nunes</u>, <u>id</u>.  "'To establish a prima facie case of prosecutorial vindictiveness, a

15   defendant must show either direct evidence of actual vindictiveness or facts that warrant an

16   appearance of such.'"  <u>Id</u>. (quoting <u>United States v. Montoya</u>, 45 F.3d 1286, 1299 (9th Cir.1995).

17          Petitioner has not met his burden of establishing a prima facie case of

18   prosecutorial vindictiveness.  There is no direct evidence of actual vindictiveness on the part of

19   the prosecution.  The chronology of events on which petitioner relies to support his claim do not

20   warrant an inference that the prosecutor increased the charges against petitioner because

21   petitioner exercised his right to a preliminary hearing.  As respondent suggests in the answer, the

22   chronology of events suggests that the case against petitioner evolved as further investigation was

23   conducted.  There is no evidence that additional charges were brought against petitioner solely

24   because he exercised the right to have a preliminary hearing.  Petitioner's third claim for relief

25   should be denied.

26   /////

D.  <u>Unlawful Detention/Search and Seizure/Denial of Credits</u>

By his fourth claim for relief, petitioner contends that his conviction was the result

of evidence obtained while he was unlawfully detained without the required probable cause.

Petitioner also claims that the state violated his right to a full and fair hearing on search and

seizure issues.  Finally, he contends that he was denied time credits for pre-sentence time served

in another jurisdiction in violation of his right to due process.

Petitioner's first two contentions arise under the Fourth Amendment.  A habeas

petitioner "is not entitled to federal habeas corpus relief for [a] Fourth Amendment claim if he

received a full and fair opportunity to litigate that claim in state court." <u>Villafuerte v. Stewart</u>,

111 F.3d 616, 627 (9th Cir. 1997) (citing <u>Stone v. Powell</u>, 428 U.S. 465, 494 (1976)).  Petitioner

has made no showing that he was denied a full and fair opportunity to litigate his Fourth

Amendment claims in the state courts and he may not obtain relief on those claims in this federal

habeas corpus action.

Petitioner's contention that he was improperly denied credit against his sentence

for time served in another jurisdiction also fails to provide a basis for relief in this federal habeas

corpus proceeding.  <u>See</u> <u>Miller v. Vasquez</u>, 868 F.2d 1116, 1118-19 (9th Cir. 1989) (federal

habeas corpus relief unavailable for alleged errors in interpretation or application of state

sentencing laws).

For the foregoing reasons, petitioner's fourth claim should be denied.

E.  <u>Confrontation Clause Violation</u>

Petitioner's fifth claim for relief is that his rights under the Confrontation Clause

were violated by the trial court's denial of a motion in limine brought by petitioner to obtain

leave to cross-examine prosecution witness Brandi Nichols concerning her alleged "obsession

with molestation."  Petition at 12.1.  Petitioner contends that this deprived him of the right to

present evidence in support of the defense contention that Ms. Nichols unduly influenced

Brittany to make the "initial allegations" against petitioner.  <u>Id</u>.  The last reasoned state court

17

1  rejection of this claim is the decision of the California Court of Appeal for the Third Appellate

2  on petitioner's direct appeal, which set out the facts relevant to the claim as follows:

3          Before trial, [petitioner] filed a motion requesting that he "be
   permitted to explore the existence of a morbid fear of sexual
4  matters, in particular child molestation, of Brandi Nichols . . . ."
   The purpose of this evidence, according to [petitioner] was to show
5  that this alleged obsession led Nichols to influence Brittany to
   maker her claims that [petitioner] molested her.  The trial court
6  denied the motion.  On appeal, [petitioner] claims the denial of this
   motion violated his rights to cross-examine and present a defense.
7  We conclude the evidence was properly excluded and the trial
   court did not violate [petitioner]'s rights to cross-examine and
8  present a defense.

9          [Petitioner]'s motion in limine stated that Nichols told Brittany
   that she found child pornography on [petitioner]'s computer and
10 that [petitioner] had visited websites concerning fathers molesting
   their daughters.  After revealing this information, Nichols then
11 asked Brittany if she had been molested, and Brittany replied that
   she had.  Nichols told Brittany that she, too, had been molested and
12 told Brittany she would not let it happen to Brittany again.  Nichols
   and Brittany made a plan to leave together, but the plan fell
13 through when Brittany was taken into protective custody.

14         In support of his request to "explore the existence of [Nichols's]
   morbid fear of sexual matters, in particular child molestation,"
15 [petitioner] quoted at length a 1964 Court of Appeal case reversing
   the denial of a motion for a new trial because the trial court had
16 prevented [petitioner] from questioning the victim's mother
   concerning, in the words of the opinion, "advances made to her by
17 various men."  (*People v. Scholl* (1964) 225 Cal.App.2d 558, 562-
   564 (*Scholl*).)  As he did in the trial court, [petitioner] relies on
18 *Scholl* in making his argument on appeal.

19         We conclude that *Scholl* does not accurately reflect current law
   and should not be followed for three reasons.  First, the *Scholl*
20 court made no attempt to apply the appropriate standard of review
   to the question of whether the questioning was properly limited.
21 Second, the defense in *Scholl* apparently made no offer of proof
   concerning what evidence the attempted line of questioning would
22 produce.  And third, the assumptions and reasoning underlying the
   *Scholl* court's conclusion are no longer valid because they are
23 outdated and have been disproved in the cases and statutes to be
   discussed below.

24         . . . .

25

26 People v. Foss, slip op. at 13-15.

18

1    The state court of appeal concluded that the trial court's decision not to allow the

2   inquiry was reviewable under the abuse of discretion standard that applies under state law to

3   decisions to admit or exclude evidence.  Id. at 16-18.  The court held that the trial court's

4   decision was not an abuse of discretion because (1) petitioner had failed to make an adequate

5   offer of proof in support of his request to cross-examine Brandi Nichols on her alleged "morbid

6   fear of child molestation" and (2) the Scholl decision on which petitioner relied had been

7   rendered "archaic" by changed "attitudes and assumptions . . . concerning the questioning of

8   witnesses other than a complaining witness in a sex crime case."  Id. at 21-22.  Following its

9   conclusion there was no abuse of discretion in excluding the proposed inquire, the state court of

10  appeal held that the trial court had not violated either petitioner's right to cross-examine

11  witnesses or to present a defense.  With respect to the right of cross-examination, the state court

12  of appeal held that because the evidence was properly excluded, the cross-examination was not

13  "'otherwise appropriate'" and therefore there was no constitutional violation.  Id. at 18 (quoting

14  Delaware v. Van Arsdall, 475 U.S. 673, 680 (1986)).  With respect to the right to present a

15  defense, the court of appeal relied on a state supreme court case for the proposition that "'[a]s a

16  general matter, the "application of the ordinary rules of evidence . . . does not impermissibly

17  infringe on a defendant's right to present a defense."'"  Id. at 26 (quoting People v. Fudge (1994)

18  7 Cal.4th 1075, 1102-1103.)

19          The Confrontation Clause of the Sixth Amendment guarantees
       the right of an accused in a criminal prosecution "to be confronted
20     with the witnesses against him." The right of confrontation, which
       is secured for defendants in state as well as federal criminal
21     proceedings, Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13
       L.Ed.2d 923 (1965), "means more than being allowed to confront
22     the witness physically." Davis v. Alaska, 415 U.S., at 315, 94
       S.Ct., at 1110. Indeed, " '[t]he main and essential purpose of
23     confrontation is to secure for the opponent the opportunity of
       cross-examination.' " Id., at 315-316, 94 S.Ct., at 1110 (quoting 5
24     J. Wigmore, Evidence § 1395, p. 123 (3d ed. 1940)) (emphasis in
       original). Of particular relevance here, "[w]e have recognized that
25     the exposure of a witness' motivation in testifying is *679 a proper
       and important function of the constitutionally protected right of
26     cross-examination." Davis, supra, at 316-317, 94 S.Ct., at 1110

1
2
3
4
5
6
7
8
9

    (citing Greene v. McElroy, 360 U.S. 474, 496 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959)). It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. And as we observed earlier this Term, "the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Delaware v. Fensterer, 474 U.S. 15, 20, 106 S.Ct. 292, 295, 88 L.Ed.2d 15 (1985) ( per curiam) (emphasis in original).

10  Delaware v. Van Arsdall, 475 U.S. at 678-79.

11
12
13
14
15
16
17
18

    Nevertheless, the Court has held that a defendant's Confrontation Clause rights have been violated when he is "prohibited from engaging in otherwise appropriate cross-examination ... and thereby 'to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness.' " [Delaware v. Van Arsdall] at 680, 106 S.Ct. 1431 (quoting Davis, 415 U.S. at 318, 94 S.Ct. 1105). "[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness." Id. Accordingly, the defendant has met his burden when he has shown that "[a] reasonable jury might have received a significantly different impression of [a witness'] credibility had ... counsel been permitted to pursue his proposed line of cross-examination." Id.

19  Slovik v. Yates, 556 F.3d 747, 752-53 (9th Cir. 2009).

20      After review of the record, this court finds that petitioner's rights under the

21  Confrontation Clause were not violated by the trial court's ruling.  Petitioner's motions in limine

22  filed in the trial court were not supported by evidence of Brandi's alleged "obsession with

23  molestation."  See Lodged Document 58, Ex. BBB.  Nor does the evaluation by Drs. Kirkpatrick

24  and Gould constitute such evidence.  See Petitioner's Ex. FF.[16]  Petitioner has not presented

25
26

    [16]  In denying petitioner's state habeas petition, the superior court made the following findings about that report: "On January 9, 2008, forensic psychologists Gould and Kirkpatrick

evidence that would satisfy his burden of showing that the jury would have received a

"significantly different impression" of Brandi's credibility if the proposed cross-examination had

been permitted.

        The state court's rejection of this claim was not contrary to controlling principles

of United States Supreme Court precedent.  This claim should be denied.

### F. Admission of Hearsay Testimony

        Petitioner's sixth claim for relief is that his right to due process was violated by

the admission of hearsay testimony.  The last reasoned state court rejection of this claim is the

decision of the California Court of Appeal for the Third Appellate District on petitioner's direct

appeal, which set forth the facts relevant to the claim as follows:

> [Petitioner] asserts in his opening brief and in a supplemental
> brief that the trial court erred by admitting evidence of Brittany's
> prior consistent statements to rehabilitate her credibility after the
> defense had elicited evidence of prior inconsistent statements.  We
> conclude the trial court did not abuse its discretion in admitting the
> prior consistent statements because case law allows such
> admission, even if the statements did not fall within the scope of
> prior consistent statements made admissible by statute.
>
> As [petitioner], again, fails to acknowledge in his opening brief
> and his supplemental opening brief, admission of evidence is
> subject to the discretion of the trial court, and we will not reverse

---

issued a report regarding testimony by the victim Brittany in Petitioner's trial.  The doctors were
contacted and presumably paid to generate this report by Julia Miller, who told the doctors she
was petitioner's fiancé.  Petitioner relies heavily on the report by Drs. Gould and Kirkpatrick as
proof that Brittany's testimony was fabricated, that she was not a victim of sexual molestation by
Petitioner, and therefore, he was falsely convicted.  [¶]  The report runs through a litany
"multiple hypothesis" to consider, and then concludes with the statement that the "data strongly
support the possibility that reliability and validity" of the allegations made against Petitioner are
"weak" and "may be of questionable accuracy."  It is important to note that this conclusion came
despite the fact that neither doctor had ever interviewed Brittany; were not present at the trial to
observe her testimony and demeanor and did not themselves cross-examine her or observe cross-
examination of her during trial.  The conclusion by Drs. Gould and Kirkpatrick is in itself total
speculation, as evidenced by the doctors' use of the words "possibility" and "may be".  The
report itself does not even come close to satisfying the Petitioner's heavy burden in proving that
a miscarriage of justice occurred.  In contrast to Drs. Gould and Kirkpatrick, twelve members of
a jury listened to and evaluated Brittany's testimony during a trial.  This fact far outweighs any
conjecture by two forensic psychologists paid by the Petitioner's fiancé."  Lodged Document 9,
Foss v. Martel, Ruling on Petition for Writ of Habeas Corpus, slip op. at 4.

unless an abuse of discretion is established.  (*People v. Vieira*, *supra*, 35 Cal. 4th at p. 292.)[17]

During the prosecution's case-in-chief, Brittany testified concerning the facts recounted above, stating that [petitioner] committed numerous molestations on her.  On cross-examination, the defense questioned Brittany about the interview conducted by Chevelle Washington of the Florida Department of Social Services on October 3, 2003, the night she was taken into protective custody.  The interview took place in Brittany's bedroom when she was awakened at about 1:00 a.m.  Brittany did not relate during that interview some of the details she later recounted in an interview in California and as a witness at trial.  For example, she did not state, during the October 3, 2003 interview, that [petitioner] had touched her vagina with his fingers, that he had touched her with his penis, or that there was an incident with a dildo.

A.  *Opening Brief Argument*

The prosecution called as a witness Officer Todd Rowen of the Redding Police Department to rehabilitate Brittany's credibility with statements she made before trial that were consistent with her testimony.  He conducted an interview with Brittany on April 15, 2005, in preparation for [petitioner]'s preliminary hearing.  During that interview, she recounted the incidents concerning which she later testified at trial.  [Petitioner] objected to the testimony as hearsay, and the trial court sustained the objection.  Later, the prosecution submitted points and authorities citing case law that we discuss below.  The trial court changed its ruling to allow Officer Rowen's testimony concerning Brittany's prior statements.

. . . .

In his supplemental brief, [petitioner] further asserts that the trial court's admission of Washington's testimony recounting Brittany's statements on October 3, 2003, the night Brittany was taken from [petitioner]'s custody, was improper.  We disagree.

The prosecution called Washington to testify.  When the prosecutor asked Washington about what Brittany had told her concerning what happened between her and [petitioner] in Florida, the defense objected based on the hearsay rule.  The trial court overruled the objection.  Washington answered, recounting the incident in which [petitioner] had Brittany pull her pants down and pull her shirt over her head.  The prosecutor then asked what Brittany had said about what happened to her in California.  The

/////

---

[17]  In his supplemental reply brief, [petitioner] concedes that his admissibility argument is reviewed only for abuse of discretion.

defense again objected based on the hearsay rule.  In response, the court addressed the jury:

"Well, this is hearsay.  Generally speaking, ladies and gentlemen, hearsay is not admissible.  There's almost as many exceptions as there are rules.  One of the exceptions is a prior consistent statement, and I assume that's what's being looked into here.  [¶]  Last week, I ruled that prior consistent statements at some other time [referring to Officer Rowen's testimony], a much later time, was not admissible, or at least at that stage of the proceedings.  However, this – and it was not admissible because it was made apparently quite a bit after the original report, what we call the disclosure.  [¶]  These statements apparently were made at the very time of disclosure.  And for that reason, I think they are admissible.  Because apparently, any disclosure that was made occurred, either at the time that the victim – alleged victim talked to this witness or maybe at the time the alleged victim talked to [Nichols].  But both of those events were almost at the same time.  So I'm going to permit it."

Washington testified that her first interview of Brittany took place at 1:00 a.m. in Brittany's bedroom when Brittany was awakened.  The interview was meant only to assess the situation and was not a forensic interview.  Brittany was emotional, and she was afraid she would be in trouble after Washington left.  When Washington asked about abuse allegations, Brittany became quiet and distant.  Concerning her question to Brittany about the California incidents, Washington testified:

"The child told me that her father, who she refers to as Ray Foss, also has told her that he needed to speak with her about sex and that he had come into her bedroom in California and showed [her] his penis.  The child stated that he told that when you have sex, the penis becomes excited and that's how it looks, referring to an aroused penis.  [¶]  The child stated that her father would make her pull down her pants and underwear and lick her vagina with his tongue.  She stated that she had to lay [*sic*] on her back, and it happened about five times in California.  [¶]  She stated that it started when she was twelve years old and after her mom died.  The child stated she was scared to tell anybody because he told her that their talks was [*sic*] personal and private and that he scared her into not telling anyone.  [¶]  She also stated she was made to sleep in the bed with Ray.

People v. Foss, slip op. at 37-44.  The court of appeal rejected petitioner's claim that the trial court had erred in admitting either set of testimony, finding that both came with an exception to the hearsay rule.  See id. at 40-42, 44-45.

/////

23

1        "[I]t is not the province of a federal habeas court to reexamine state-court

2  determinations on state-law questions.  In conducting habeas review, a federal court is limited to

3  deciding whether a conviction violated the Constitution, laws, or treaties of the United States."

4  <u>Estelle v. McGuire</u>, 502 U.S. 62 (1991) (citing 28 U.S.C. § 2241; Rose v. Hodges, 423 U.S. 19,

5  21, (1975) (per curiam )).  Because federal habeas relief does not lie for state law errors, a state

6  court's evidentiary ruling is grounds for federal habeas relief only if it renders the state

7  proceedings so fundamentally unfair as to violate due process.  <u>See</u> <u>Drayden v. White</u>, 232 F.3d

8  704, 710 (9th Cir. 2000) (citations omitted).  The evidentiary rulings challenged by petitioner did

9  not render his trial fundamentally unfair.  The state court's rejection of this claim was neither

10  contrary to nor an unreasonable application of relevant principles of United States Supreme

11  Court case law.  This claim should be denied.

12                  G.  <u>Ineffective Assistance of Counsel</u>

13        In his seventh claim for relief, petitioner claims that his attorney provided

14  constitutionally ineffective assistance of counsel by (1) failing to consult and retain a forensic

15  psychiatric expert; (2) move for an evidentiary hearing to evaluate the reliability of Brittany's

16  extrajudicial statements; (3) moving for dismissal prior to trial; (4) investigating computer

17  evidence offered at trial; and (4) taking depositions of trial witnesses.  The last reasoned state

18  court rejection of a claim of ineffective assistance of counsel raised by petitioner is the decision

19  of the Shasta County Superior Court on petitioner's petition for writ of habeas corpus filed in that

20  court.  The superior court rejected the claim raised before it as follows:

21             Petitioner continues to build upon his contention that he
          received ineffective assistance of counsel, adding new arguments
22          in both his writ of habeas corpus and in his Traverse.  Nowhere,
          however, in these 200 plus pages does Petitioner ever state how he
23          would have achieved a better result.  The issue of ineffective
          assistance of counsel was directly addressed by the California
          Supreme Court for the purpose of Habeas Corpus in *People v.*
24          *Karis* (1988) 46 Cal.3d 612, at p. 657.  The court stated a petitioner
          must show counsel's performance "fell below an objective
25          standard of reasonableness...under prevailing professional norms."
          <u>Then</u>, the petitioner is required to demonstrate a "reasonable
26

1   probability exists that a more favorable outcome would have been
    reached absent the deficient performance." (*In re Cordero* (1988)
2   46 Cal.3d 161 at p. 180.)

3        Petitioner demonstrates his ignorance of legal procedure in
    insisting that his attorney should have moved for a "pre-trial
4   evidentiary hearing" to "prove the reliability and accuracy" of
    victim Brittany's testimony.  In California, there is no "pre-trial
5   evidentiary hearing" in which a defense attorney or prosecutor can
    "test out" their witness' testimony.  As the People correctly pointed
6   out in their Return, there is only the trial.  Petitioner also states that
    his attorney had a duty to interview witnesses before the trial.
7   However, as most attorneys who practice criminal law know,
    witnesses are not obliged to talk pre-trial with either defense
8   attorneys or prosecutors.  It is entirely possible that Petitioner's
    attorney or his staff attempted to contact and interview the
9   witnesses, and the witnesses refused.  Petitioner does not state facts
    sufficient to indicate that that may have been the case.

10
         Petitioner also faults his attorney for not conducting a "pre-trial
11  investigation" on computer evidence.  This, again, shows
    Petitioner's flawed logic in attempting to convince the court to
12  grant his petition.  According to police, one witness claimed she
    had seen pornography on the Petitioner's computer.  However,
13  when the computer was analyzed by police, no pornography was
    found.  Most criminal defendants would view this evidence as
14  favorable to them because it demonstrates the witness is untruthful
    or  has a poor memory.  Petitioner, however, argues that there
15  could have been "another interpretation" of this evidence and
    therefore, his attorney was ineffective for not having the
16  "evidence" analyzed.  This is simply an absurd argument and is
    indicative of Petitioner's entire line of reasoning.

17

18  Lodged Document 9, <u>Foss v. Martel</u>, #08HB5424, slip op. at 3-4.

19        In order to prevail on his claim of ineffective assistance of counsel, petitioner

20  must show two things, an unreasonable error and prejudice flowing from that error.  First

21  petitioner must show that, considering all the circumstances, counsel's performance fell below an

22  objective standard of reasonableness.  <u>Strickland v. Washington</u>, 466 U.S. 688 (1984).  The court

23  must determine whether in light of all the circumstances, the identified acts or omissions were

24  outside the wide range of professional competent assistance.  <u>Id.</u> at 690.  "Review of counsel's

25  performance is highly deferential and there is a strong presumption that counsel's conduct fell

26  /////

1   within the wide range of reasonable representation." United States v. Ferreira-Alameda, 815

2   F.2d 1251 (9th Cir. 1986).

3          Second, petitioner must prove prejudice. Strickland at 693. To demonstrate

4   prejudice, petitioner must show that "there is a reasonable probability that, but for counsel's

5   unprofessional errors, the result of the proceeding would have been different." Id. at 694. A

6   reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id.

7   The focus of the prejudice analysis is on "whether counsel's deficient performance renders the

8   result of the trial unreliable or the proceeding fundamentally unfair." Lockhart v. Fretwell, 506

9   U.S. 364, 372 (1993). "[A] court need not determine whether counsel's performance was

10  deficient before examining the prejudice suffered by the defendant as a result of the alleged

11  deficiencies. . . .  If it is easier to dispose of an ineffectiveness claim on the ground of lack of

12  sufficient prejudice, . . . , that course should be followed." Strickland, 466 US. at 697.

13         Petitioner has made no showing that the result of the criminal proceedings against

14  him would have been different had counsel done any of the acts he now contends should have

15  been done. The state court's determination that he had not shown any cognizable prejudice is

16  entirely congruent with applicable principles of United States Supreme Court precedent and

17  grounded in a reasonable determination of the facts. This claim should be denied.

18                 H.  Prosecutorial Misconduct

19         In his eighth claim for relief, petitioner claims that his constitutional rights were

20  violated by prosecutorial misconduct. Petitioner claims that the prosecutor committed

21  misconduct by failing to instruct Brandi Nichols not to volunteer any inadmissible testimony, in

22  her cross-examination of Chevelle Washington, and in her closing argument. The last reasoned

23  state court rejection of this claim is the decision of the California Court of Appeal for the Third

24  Appellate District on petitioner's direct appeal. The court of appeal set forth the facts relevant to

25  the first contention as follows:

26  /////

> [Petitioner] contends the prosecutor committed misconduct by failing to prevent a witness from mentioning [petitioner]'s drug use, despite the court's direction to instruct witnesses not to mention [petitioner]'s drug use. . . .
>
> Before trial, [petitioner] moved for an order requiring the prosecution to advise its witnesses not to mention [petitioner]'s drinking habits or drug usage. The court granted the motion.
>
> Nichols testified during the prosecution's rebuttal. On cross-examination, defense counsel asked whether she had told her grandparents that [petitioner] murdered his best friend (Brittany's father), married his best friend's wife (Brittany's mother), then murdered her. Nichols denied it, stating that she had told her grandfather that she "wondered" whether [petitioner] had been involved in the death of Brittany's father. On redirect examination, the prosecutor asked Nichols what gave her the impression [petitioner] had been involved in the death of Brittany's father. She replied: "[[Petitioner]] and I used to party and – there was one night that we were just hanging out. We had been doing cocaine that evening and he had made the comment to me about how him and Richard [Brittany's father] used to, I guess, transport illegal substances and that he had had some issues about that. We were on drugs, so I can't really tell you exactly word for word. But he had said that he didn't treat Tammy [Brittany's mother] very well, and he didn't like the way that those things were going, and wasn't it kind of nice the way that things worked out, that he died and he got to be with Tammy." Defense counsel did not object.

People v. Foss, slip op. at 46-47. The court of appeal rejected petitioner's claim that the prosecutor's questioning constituted misconduct on two grounds. First, the court found that petitioner had not objected at trial and therefore had not preserved the issue for appeal. Second, the court found "speculation, at best" petitioner's contention that Nicole's testimony was evidence that the prosecutor had not complied with the court's ruling. Id. at 47-48.

The court of appeal addressed petitioner's remaining contentions of prosecutorial misconduct as follows:

> [Petitioner] contends that the prosecutor committed prejudicial misconduct by (1) asking a witness, Chevelle Washington, an improper question, (2) making factual misstatements during closing argument, and (3) vouching for Brittany's credibility during closing argument. We conclude the prosecution did not commit prejudicial misconduct in its questioning of Washington. We also conclude [petitioner] failed to preserve the second and third issues

(misstatements and vouching in closing argument) because he did not object to those statements.

Anticipating our determination that he did not preserve the two contentions of prosecutorial misconduct during closing argument because he failed to object, [petitioner] asserts the failure to object constituted ineffective assistance of counsel.  We conclude trial counsel was not deficient for not objecting.

A. *Prosecutorial Misconduct*

1. *Improper Questioning*

[Petitioner] asserts the prosecutor improperly asked Washington, the worker from the Florida Department of Children and Families, whether she had any indication during the interview with Brittany that Brittany was lying.  We conclude that the prosecutor's question was not prejudicial and, therefore, we need not determine whether it constituted misconduct.

Questioning by a prosecutor can constitute prosecutorial misconduct.  (*People v. Wagner* (1975) 13 Cal.3d 612, 619-620.)  To justify reversal, such misconduct must be prejudicial – that is, "the acts of misconduct are such as to have contributed materially to the verdict."  (*Id*. at p. 621.)

Before trial, [petitioner] made a motion for an order prohibiting the prosecution to ask any expert for an opinion concerning the truthfulness of Brittany of Brittany's allegations of abuse.  The trial court granted the motion.

During the prosecution's case-in-chief, defense counsel cross-examined Washington concerning whether Brittany had expressed dislike for [petitioner] for various reasons, such as his dating other women while her mother was dying.  On redirect examination, the prosecutor asked Washington:  "Did you get any indication that – from her, her demeanor or anything that night, that what she was saying, that she was making it up?"  Defense counsel objected to the question as "[i]mproper opinion testimony," and the court sustained the objections.

Concerning prejudice, [petitioner] asserts this question "convey[ed] to the jury that the prosecutor knew that Ms. Washington did, in fact, believe Brittany."  This assertion is nothing more than speculation.  The court instructed the jury not to guess concerning the answer to any question as to which an objection was sustained and that it must not assume as true any insinuation suggested by a question.  The question was isolated and not so egregious that the jury could not follow the court's instructions.  [Citation omitted.]  Because we conclude the questioning did not materially contribute to the verdict and was

1    therefore not prejudicial, we need not determine whether the
2    prosecutor committed misconduct by asking the question.

3    People v. Foss, slip op. at 49-51.

4    Finally, as noted above, the court of appeal held that petitioner had failed to object

5    to  numerous comments made by the prosecutor during closing argument that petitioner

6    contended were misconduct, and that his claim of prosecutorial misconduct was therefore not

7    preserved.  The court found that eight of the comments made by the prosecutor were

8    "insignificant factual misstatements."  Id. at 54-56.  The court found that four of the comments

9    were not misstatements at all.  Id. at 56-58.  Finally, the court concluded that the prosecutor had

10   not improperly vouched for Brittany's credibility.  Id. at 59-60.

11   Success on a claim of prosecutorial misconduct requires a showing that the

12   conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due

13   process.'"  Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo,

14   416 U.S. 637, 643 (1974)).  The court "must examine the 'entire proceedings' to determine"

15   whether the challenged conduct violated petitioner's due process right to a fair trial.  Sechrest v.

16   Ignacio, 549 F.3d 789, 807 (9th Cir. 2008) (quoting Hall v. Whitley, 935 F.2d 164, 165 (9th

17   Cir.1991) (per curiam) (in turn quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct.

18   1868, 40 L.Ed.2d 431 (1974))).

19   After review of the record, this court finds that none of the conduct petitioner cites

20   as prosecutorial misconduct rendered his trial fundamentally unfair.  The state court's rejection of

21   this claim was entirely congruent with relevant principles of United States Supreme Court

22   precedent.  Petitioner's eighth claim for relief should be denied.

23   I.  Denial of Full and Fair Hearing and Right to Counsel on State Habeas Corpus

24   By his ninth claim for relief, petitioner claims that his constitutional rights to "full

25   and fair hearing on habeas corpus" and to due process were denied by the state courts' failure to

26   follow state procedural requirements in considering his state habeas corpus petitions.  Petitioner

1  also claims that the state superior court violated his constitutional right to effective assistance of

2  counsel by denying him a "full and fair hearing" on his motion to replace counsel appointed to

3  represent him in the state habeas corpus proceedings.  Neither contention presents a cognizable

4  federal claim.

5         Federal habeas corpus jurisdiction under 28 U.S.C. § 2254 is limited to petitions

6  brought "in behalf of a person in custody pursuant to the judgment of a State court only on the

7  ground that he is in custody in violation of the Constitution or laws or treaties of the United

8  States." 28 U.S.C. § 2254.  Federal "[h]abeas corpus relief is 'unavailable for alleged error in the

9  interpretation or application of state law.'" Windham v. Merkle, 163 F.3d 1092, 1107 (9th Cir.

10 1998) (quoting Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir.1985)).  Moreover, the

11 contentions made by petitioner in support of this aspect of his claim, see Attachment to Petition

12 at 68-82, implicate only the determination of which standard of review is applied by this court to

13 consideration of petitioner's federal claims and the deference owed, if any, by this court to the

14 state courts' rejection of those claims.  Those contentions do not raise a separately cognizable

15 claim.

16        With respect to the second aspect of this claim, petitioner has no federal

17 constitutional right to the assistance of counsel in state habeas corpus proceedings. See Coleman

18 v. Thompson, 501 U.S. 722, 757 (1991); see also Bonin v. Vasquez, 999 F.2d 425, 430 (9th Cir.

19 1993).

20        For the foregoing reasons, petitioner's ninth claim for relief is not cognizable in

21 this federal habeas corpus proceeding.

22        J.  State Court Error on Direct Appeal

23        In his tenth claim, petitioner contends that his right to due process and "adequate

24 appellate review" was violated when the state court of appeal, in resolving petitioner's claim that

25 there was insufficient evidence of duress to support his conviction on eight counts, applied a

26 different definition of duress than had been applied by the trial court.  Similar to his ninth claim

1    for relief, a challenge to the legal standard applied by a state court in rejecting a federal

2    constitutional claim implicates, at most, only the standard of review or the deference owed that

3    decision by a federal court sitting in habeas corpus.  It does not present a separately cognizable

4    claim.[18]

5                                    K.  Cumulative Impact

6           Finally, petitioner claims that his due process rights were violated by the

7    cumulative impact of the foregoing alleged violations of his constitutional rights.  Because none

8    of the foregoing claims have merit, his cumulative impact claim is also without merit and should

9    be denied.

10          Pursuant to Rule 11 of the Rules Governing Section 2254 Cases in the United

11   States District Courts, "[t]he district court must issue or a deny a certificate of appealability when

12   it enters a final order adverse to the applicant."  Rule 11, 28 U.S.C. foll. § 2254.  A certificate of

13   appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial

14   showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The court must either

15   issue a certificate of appealability indicating which issues satisfy the required showing or must

16   state the reasons why such a certificate should not issue.  Fed. R. App. P. 22(b).  For the reasons

17   set forth in these findings and recommendations, petitioner has not made a substantial showing of

18   the denial of a constitutional right.  Accordingly, no certificate of appealability should issue.

19          In accordance with the above, IT IS HEREBY ORDERED that:

20          1.  Petitioner's March 7, 2012 motion for extension of time is granted;

21          2.  Petitioner's March 19, 2012 reply is deemed timely filed;

22          3.  Petitioner's March 22, 2012 motion for extension of time is granted;

23          4.  Petitioner's March 27, 2012 reply is deemed timely filed;

24  _____

25   [18]  In the amended answer, respondent addresses this claim as if petitioner were
     contending that the state courts' rejection of his sufficiency of the evidence claim was
     unreasonable.  The court does not construe petitioner's tenth claim for relief as a challenge to the
26   sufficiency of the evidence used to support any finding of duress.

5.  Petitioner's November 30, 2011 motion to expand the record is denied;

6.  Petitioner's December 3, 2011 motion for evidentiary hearing is denied;

7.  Petitioner's February 21, 2012 motion to expand the record is denied;

8.  Petitioner's April 30, 2012 motion is denied; and

 IT IS HEREBY RECOMMENDED that:

1.  Petitioner's application for a writ of habeas corpus be denied; and

2.  The district court decline to issue a certificate of appealability.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: May 2, 2012.

UNITED STATES MAGISTRATE JUDGE

12
foss3551.157